# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

JODIE D.,

     Plaintiff,

v.                                  CIVIL ACTION NO. 3:25-cv-00563

FRANK BISIGNANO,
Commissioner of Social Security,

     Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Jodie D. ("Claimant") seeks review of the final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f. This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred by standing order to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3). Presently pending before this Court are Claimant's *Brief in Support of Complaint* (ECF No. 9) and the Commissioner's *Brief in Support of*

*Defendant's Decision* (ECF No. 12). Having fully considered the record and the parties' arguments, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), **GRANT** the Commissioner's request to affirm his decision (ECF No. 12), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

I.      **BACKGROUND**

A.      **Information about Claimant and Procedural History of Claim**

Claimant was forty-one years old at the time of her alleged disability onset, and fifty-one years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 218, 991).[1] She has an eleventh-grade education, and no past relevant work experience. (Tr. 261, 989). Claimant alleges that she became disabled on March 1, 2015, due to the following physical impairments: seizures; anxiety; depression; bipolar disorder; gastroesophageal reflux disorder ("GERD"); chronic obstructive pulmonary disease ("COPD"); bilateral carpal tunnel syndrome; restless leg syndrome; neuropathy; gout; insomnia; ulcers; asthma; cartilage damage in both knees; cysts on her ovaries; short term memory loss; cervical impairment; headaches; edema; chest pain; hearing loss; and panic attacks. (Tr. 218, 260, 302, 336).

Claimant filed her applications for Title II and Title XVI benefits (together, the "claim") on March 4, 2020. (Tr. 10). The Social Security Administration (the "Agency") denied the claim initially on November 12, 2020, and again upon reconsideration on August 24, 2021. *Id.* Thereafter, Claimant filed a written request for hearing which was received by the Agency on September 16, 2021. *Id.* An administrative hearing was held before an ALJ on February 23, 2023. *Id.* Subsequently on March 21, 2023, the ALJ

---

[1] References to "Tr." refer to the administrative *Transcript of Proceedings* filed in this action at ECF No. 6.

entered an unfavorable decision. (Tr. 10-23). Claimant then sought review of the ALJ's decision by the Appeals Council that same day. (Tr. 1). The Appeals Council denied Claimant's request for review on September 15, 2023. (Tr. 1-3). Subsequently, Claimant sought review of the Agency's decision in this Court pursuant to 42 U.S.C. § 405(g). The Court granted the Commissioner's voluntary motion to remand the action back to the Agency for further proceedings on March 19, 2024. (Tr. 1048-49).

On October 18, 2023, following remand, Claimant filed subsequent applications with the Agency for a period of disability and disability insurance benefits as well as supplemental-security income. (Tr. 1060-69, 1070-79, 1180-86, 1187-93). The Appeals Council consolidated all of the claims. (Tr. 1056-57). After the claims were consolidated before the Agency, Claimant attended a new hearing before an ALJ on April 10, 2025. (Tr. 1001-18). Claimant was represented by an attorney and testified at the hearing along with a vocational expert. *Id.* On May 27, 2025, the ALJ issued an unfavorable decision. (Tr. 977-91).

Claimant brought the present action on September 22, 2025, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed a transcript of the administrative proceedings on November 18, 2025. (ECF No. 6). Claimant subsequently filed her *Brief in Support of Complaint* on January 19, 2026. (ECF No. 9). In response, the Commissioner filed his *Brief in Support of Defendant's Decision* on February 19, 2026. (ECF No. 12). Claimant then filed her *Reply Brief* on March 3, 2026. (ECF No. 13). Accordingly, this matter is ripe for adjudication.

## B.     Relevant Evidence

The undersigned has considered all evidence of record pertaining to the parties' arguments, including the medical evidence,[2] and summarizes the relevant portions herein for the convenience of the United States District Judge.

### i.     Treatment Records

Overall, Claimant has generally not engaged in formal mental-health treatment. However, she has received psychological evaluations, has been referred to psychiatry, and was prescribed medications for depression and anxiety by her primary-care providers.[3]

On July 8, 2014, Claimant presented to the Emergency Room at Pleasant Valley Hospital in Point Pleasant, West Virginia stating that she was having "an anxiety attack" due to being "out of [her] Xanax." (Tr. 793). She reported that she was "using Wellbutrin but higher doses cause insomnia." *Id.* On examination, she presented as anxious, acutely ill, and uncomfortable. (Tr. 794). Her mental status was "grossly normal," with an anxious affect but normal judgment. (Tr. 795). She was discharged with a primary impression of chest wall pain and a secondary impression of anxiety. (Tr. 797). She was given a sixty-day prescription for Xanax and instructed to follow up with her family doctor. *Id.*

On April 19, 2015, Claimant returned to the Emergency Room at Pleasant Valley Hospital with possible chest pain/anxiety. (Tr. 756). Claimant reported that "she was recently taken off of Xanax by her primary care physician." *Id.* On examination, her mental-status examination was grossly normal, with normal affect and normal judgment.

---

[2] Claimant does not raise issues related to her physical impairments in this § 405(g) action; accordingly, the undersigned confines the medical-records summary herein to records relevant to Claimant's mental health. Further, as Claimant explains in her opening brief, "[d]ue to the nature of [her] arguments, a detailed summary of the medical evidence is not necessary." (ECF No. 9 at 2).

[3] The medical records include records from Wes P. Wagner, D.O. (Tr. 831-92). However, those records are largely handwritten and illegible. *See id.*

(Tr. 758). Claimant was discharged with a diagnosis of pleurisy without effusion and a secondary impression of anxiety. (Tr. 762). She was referred to primary-care provider Robert Tayengco, M.D. *Id.*

On August 9, 2017, Claimant presented for intake at Prestera Center as a result of pending felony drug possession charges. (Tr. 537). She reported depression and anxiety resulting in lack of motivation, self-isolation, and struggling to complete daily tasks. *Id.* On examination, Claimant's thought content was within normal limits; her thought process was logical; her speech was normal; her affect was appropriate; her mood was angry; and she showed restlessness/fidgetiness with her motor behavior. (Tr. 538). Her attention/concentration was "focused" and her memory was "intact." (Tr. 539). Her behavior was noted to be cooperative. *Id.* She was diagnosed with (1) moderate major depressive disorder, recurrent episode; (2) unspecified anxiety disorder; (3) opioid-use disorder, mild sustained remission; (4) bereavement; (5) personal history of spouse or partner violence; (6) personal history of spouse or partner psychological abuse; (7) other problem related to employment; and (8) problems related to other legal circumstances. (Tr. 540). Claimant reported that she was "already comfortable with her current therapist and medications prescribed from [her primary-care provider] PCP" and "opted not to schedule any services through Prestera" at that time. (Tr. 536). As a result, "[n]o appointments [were] . . . scheduled at [that] time for [Claimant]." *Id.*

On February 1, 2018, Claimant presented to the Emergency Department at Pleasant Valley Hospital in Point Pleasant, West Virginia with a rash and swelling on her legs. (Tr. 608). She reported anxiety, irritability, and panic attacks. (Tr. 609). The primary impression was anxiety. (Tr. 613). She was referred to a primary-care provider for follow-up. *Id.*

5

On June 23, 2018, Claimant returned to the Pleasant Valley Hospital Emergency Department with left-ankle pain. (Tr. 598). She denied anxiety. (Tr. 599). On examination, she was found to be alert and oriented. (Tr. 600).

On October 24, 2020, Claimant returned to the Pleasant Valley Hospital Emergency Department with shortness of breath. (Tr. 1458). On examination, she was noted to be awake, alert, and oriented, answering questions appropriately, and in no acute distress. (Tr. 1459). Claimant stated that she "feels that this could be anxiety." *Id*. The Emergency Department physician "told her [he] would be happy to give her something for anxiety if she can secure a ride home." *Id*. She was discharged with a diagnosis of "asthma with exacerbation" and instructed to follow up with her primary-care provider on Monday. (Tr. 1461).

On June 8, 2021, Claimant presented to Kylen Whipp, M.D., with Pleasant Valley Hospital in Point Pleasant, West Virginia "to establish care" after being seen in the emergency department recently. (Tr. 1570). Dr. Whipp noted that Claimant "appeared to have some difficulty keeping her eyes open" and "also appeared to be slurring her words at times as well when trying to speak." (Tr. 1574). Dr. Whipp further noted that Claimant "had a difficult time keeping focused on [the] topic at hand as well when trying to ask her questions." *Id*. Claimant reported anxiety and depression and stated that a previous primary-care provider "diagnosed her with bipolar disorder." *Id*. Claimant reported that she "was previously on Wellbutrin and was switched to Cymbalta but she is unsure why she was switched." *Id*. Claimant stated "she has been off of her Cymbalta for several weeks but just picked up her new prescription yesterday for this." *Id*. Claimant reported she had been "on several medications previously" for her mental-health impairments including Zoloft, "but asked to stop this several years ago due to possibility of weight gain with this."

*Id.* Claimant reported that she "is on Klonopin . . . as well and has been on this for some time" in addition to "Motrin, Zanaflex and Lyrica for chronic pain as well." *Id.* On examination, she was "lethargic and tired appearing," with an "altered mental status." *Id.* Dr. Whipp assessed acute anxiety and depression and noted in the treatment records that she had "significant concerns for [Claimant's] current mental status given her medication regimen" and discussed with Claimant "that if she continued to follow with me, I would be tapering down her Klonopin with a goal of only having this for rare use or stopping completely." (Tr. 1576). She was started on Zoloft and advised "to stop her Cymbalta[.]" *Id.* Claimant "did express hesitancy that [Dr. Whipp] would not prescribe her Klonopin" and asked instead for "anything like valium or Ativan." *Id.* Dr. Whipp advised that "this was not meant for daily use given the risk of addiction potential with daily use." *Id.* Dr. Whipp instructed Claimant to return in one month "to discuss her mood and continue tapering her Klonopin down further." *Id.* Finally, she ordered a urine drug screen. *Id.*

On August 16, 2021, Claimant presented to Santpal S. Mavi, M.D., with Holzer Clinic in Gallipolis, Ohio, for a consultation regarding shortness of breath. (Tr. 1349). Treatment notes indicate that Claimant was "pleasant," with "good eye contact" and normal mood and affect. (Tr. 1352).

On March 28, 2022, Claimant presented to Robert Tayengco, M.D., with Pleasant Valley Hospital in Point Pleasant, West Virginia. (Tr. 894). She reported anxiety and an abnormal sleep pattern. (Tr. 898). She reported that she filed for disability and was denied, but that her anxiety was "severe" such that she was "not able to work." (Tr. 899). On examination, her mental-status was noted to be "grossly normal." *Id.* She was assessed with acute anxiety and depression. *Id.* Dr. Tayengco informed Claimant that he "will not prescribe Xanax." *Id.* Her referred her to psychiatry. *Id.*

On May 11, 2022, Claimant presented to Holzer Clinic in Gallipolis, Ohio, to establish new-patient care. (Tr. 920). Claimant reported that the reason for her visit was that her prior provider "will not prescribe her anxiety medication [Xanax] and referred her to a psychiatrist," who "would not see her with a referral from a doctor in [West Virginia]." *Id.* She reported that her daily prescription medications included medications for depression and anxiety symptoms, including alprazolam, bupropion, and hydroxyzine. (Tr. 921). She reported depressive disorder with an onset of March 2010. (Tr. 922). She reported feeling "down and depressed" as well as "chest pain and heart racing" due to anxiety. (Tr. 923). She reported experiencing shortness of breath "with panic." (Tr. 924). On examination, she exhibited "normal mood and affect" as well as good judgment and insight. *Id.* She was assessed with mixed anxiety and depressive disorder. She was started on hydroxyzine as needed for panic and continued on her bupropion (Wellbutrin) medication as previously prescribed. (Tr. 924-25).

On June 29, 2022, Claimant presented to Jessica Wilson, D.O., at Pleasant Valley Hospital in Point Pleasant, West Virginia. (Tr. 934). Claimant reported that she was there "to establish care" and to obtain help for her anxiety. (Tr. 935, 938). Claimant reported an "extensive history of anxiety disorder" and that she had "been referred to psychiatry" twice. (Tr. 938). She reported using Suboxone off the street to "take[] the edge off" and further reported that she had used in the previous four months. *Id.* She was assessed with (1) generalized anxiety disorder with panic attacks; (2) generalized anxiety disorder; (3) panic disorder; (4) illicit drug use, acute; (5) other psychoactive substance use, unspecified, uncomplicated; (6) anxiety and depression, acute; (7) anxiety disorder, unspecified; and (8) major depressive disorder, single episode, unspecified. (Tr. 939). She was started on a mood stabilizer and informed that Dr. Wilson would not prescribe any

"controlled substances." *Id*. A urine screen was positive for suboxone. *Id*. Finally, she was referred to psychiatry. *Id*.

On February 1, 2023, Claimant presented to Jenna Barbour, M.D., with Holzer Clinic in Gallipolis, Ohio. (Tr. 1425). Claimant reported that "she is following with Dr. Dachowski" who "has her on Wellbutrin and Klonopin." (Tr. 1428). She reported that "[s]he was recently diagnosed with ADHD and [Dr. Dachowski] started her on a low dose of Adderall." *Id*. Claimant reported that "[s]he does feel it is helping [with] her focus." *Id*. On examination, she demonstrated good judgment as well as normal mood and affect; further, her recent and remote memory were both normal. *Id*. She was assessed with mixed anxiety and depressive disorder and instructed to continue on her medications as prescribed by Dr. Dachowski. (Tr. 1429).

On May 26, 2023, Claimant followed up with Dr. Barbour. (Tr. 1417). Claimant reported that she "does not think her Wellbutrin is working" and that she wanted to discuss diet medications. *Id*.  She reported that she was currently following with Holzer psychiatry. (Tr. 1422). She requested that the medication level be adjusted because "she does not feel that her symptoms are well controlled for either the anxiety and depression or the adult ADHD." (Tr. 1420, 1422). On examination, she showed good judgment as well as normal mood and affect. (Tr. 1421). She was advised that "since she is following with psychiatry, they need to make the adjustments to her medications." (Tr. 1422).

On October 31, 2023, Claimant presented to Jay Akin, M.D., at Rivers Health in Point Pleasant, West Virginia, to establish care. (Tr. 1554, 1558). Dr. Akin noted that Claimant "[h]as seen 3 other physicians in this practice, with each of which she has been dissatisfied . . . . Now [she] has [a] psychiatrist prescribing bupropion, clonazepam, and Adderall." (Tr. 1558). Claimant had no acute issues to report. *Id*. On examination, Dr.

Akin noted that Claimant was lying on her stomach on the examination table to fill out paperwork when he entered the examination room, and that she had "[s]omewhat heavy eyelids when talking" as well as "[s]low speech without frank slurring." (Tr. 1559). Claimant had a congruent mood and normal affect, with fair insight and judgment. (Tr. 1560). She was assessed with, *inter alia*, acute anxiety disorder, unspecified. (Tr. 1562). Dr. Akin made a note to obtain records from Claimant's "psych provider" and previous primary-care provider. *Id.* Further, he indicated that random drug testing "will probably be indicated[.]" *Id.*

Claimant followed up with Dr. Akin on May 1, 2024. (Tr. 1564). Claimant reported that she wished to lose weight; all other conditions were noted to be "stable." (Tr. 1568). On examination, Dr. Akin found that Claimant was "cooperative and [in] no acute distress"  and that "[a]ll other conditions are stable." (Tr. 1638-39). Dr. Akin assessed, *inter alia*, acute bipolar disorder. (Tr. 1640). He recommended that Claimant follow up in six months. *Id.*

On January 14, 2025, Claimant presented to Johnny Ellison, D.O., at Holzer Clinic in Gallipolis, Ohio. (Tr. 1682). She reported that her medications were "working as prescribed." (Tr. 1684). On examination, Dr. Ellison found that Claimant had good judgment, normal mood and affect, and was active and alert. (Tr. 1685). Dr. Ellison did not assess any mental-health diagnoses. *See id.*

### ii.    Claimant's Hearing Testimony

At the April 10, 2025 administrative hearing before the ALJ, Claimant was represented by counsel and testified under oath. (Tr. 1001-18). Claimant testified that her doctor revoked her driving privileges because she experiences periodic seizures. (Tr. 1007-15). She has insomnia and needs to take naps during the day. Her son helps her with

outdoor tasks. (Tr. 1013). She further testified that she is able to prepare simple meals, but does not grocery shop. *Id*. It takes her "all day long just to wash a couple of dishes." *Id*. She has panic attacks around groups of people. (Tr. 1014). Her anxiety is high and she experiences depression on a daily basis, including crying spells. *Id*. She attributes her depression to being unable to do the things she used to do as a result of pain associated with her physical impairments. *Id*.

### iii.    Vocational Expert Testimony

At the April 10, 2025 administrative hearing, the ALJ employed a vocational expert ("VE"). (Tr. 1015). The ALJ asked the VE to assume that a hypothetical individual had the same age, education, and work history as the Claimant who was capable of performing work at the light exertional level, with some additional limitations, as follows:

> [The hypothetical individual] [c]an never crawl or climb ladders, ropes and scaffolds. Can occasionally balance, stoop, kneel, crouch and climb ramps and stairs. Can frequently handle and finger with both hands. Must avoid concentrated exposure to extreme cold, extreme heat, wetness, loud noise and vibrations. Must avoid even moderate exposure to irritants such as fumes, dust, odors, gases and poorly ventilated areas. And hazards such as moving machinery and unprotected heights. The individual can understand, remember and carry out simple instructions. Can frequently interact with the public, co-workers and supervisors. Can maintain concentration, persistence and pace for simple tasks. And can adapt to changes in the work setting.

*Id*. In response to the ALJ's hypothetical terms, the VE testified that such a person could perform the following representative occupations: (1) "Tag Inserter," with 20,000 jobs in the national economy; (2) "Fruit Garnisher," with 15,000 jobs; and (3) "Night Cleaner," with 92,000 jobs. (Tr. 1016).

### iv.    Consultative Evaluation

Claimant underwent a consultative evaluation by Psychologist Kara Gettman-Hughes, M.A., on September 29, 2020. (Tr. 69, 811-17). Claimant reported depression,

anxiety/panic, as well as physical pain. She reported difficulty with household chores although she could otherwise complete activities of daily living; further, she reported that she chooses not to drive and that she functions better with written instructions. *Id.* A mental-status examination indicated an observed anxious mood and congruent affect; circumstantial thought processes with no evidence of delusions, paranoia, obsessive thoughts, compulsive behaviors, or unusual psychomotor behaviors; and no evidence of unusual perceptual experiences. *Id.* Judgement was within normal limits based on her responses to comprehension questions, and insight was poor based on her response to questions regarding social awareness. *Id.* Social functioning during the evaluation was mildly impaired based on clinical observations of social interaction with the examiner and others, including observed mood, eye contact, sense of humor, mannerisms, and appearance. *Id.* Claimant denied suicidal or homicidal ideation. *Id.* Immediate memory was normal, based on her ability to instantly recall four out of four words; recent memory was mildly-to-moderately impaired; and remote memory was mildly deficient based on her ability to recall details of her personal history. *Id.* Concentration was severely impaired; persistence was mildly deficient based on her ability to remain on task; and pace was slow. *Id.*

Following remand to the Agency, Claimant underwent a second consultative evaluation by Psychologist Gettman-Hughes on June 6, 2024. (Tr. 1063, 1583-89). At the examination, Claimant's speech was noted to be slurred, and she appeared sedated. (Tr. 1064). Claimant denied any history of alcohol or drug use, but Ms. Gettman-Hughes noted that this was inconsistent with the records. *See id.* Claimant's mental-status examination resulted in a finding of proper hygiene; a "somewhat cooperative" attitude; "fair" eye contact; somewhat loquacious and slurred speech; a mood remarkable for

symptoms of mild anxiety; a restricted affect; mildly-impaired judgment; mild psychomotor retardation; moderately-deficient persistence based on her ability to remain on task; moderately-impaired concentration; and a "very slow" pace. (Tr. 1063-64). Her immediate and recent memory were mildly impaired, and her remote memory was mildly-to-moderately deficient based on her ability to recall details of her personal history. *Id.* Her insight was poor based on her response to questions regarding social awareness. *Id.* Claimant was oriented to person, time, place, and circumstance; thought processes were circumstantial; there was no evidence reflecting delusions, paranoia, obsessive thoughts, compulsive behaviors, or unusual perceptual experiences; and she denied suicidal and homicidal ideation. *Id.* She was diagnosed with major depressive disorder—recurrent, moderate; generalized anxiety disorder; panic disorder; unspecified attention-deficit/hyperactivity disorder ("ADHD"); and a history of opioid abuse. *Id.*

### v.    Administrative Findings

The evidence of record contains opinions from three state-agency psychologists. First, John Todd, Ph.D. offered an opinion at the initial level on October 19, 2020. (Tr. 68-70). Dr. Todd opined that Claimant's impairments of "depressive, bipolar and related disorders" as well as "anxiety and obsessive-compulsive disorders" were "severe." (Tr. 68). He opined that Claimant was moderately limited with respect to her ability to "concentrate, persist, or maintain pace" such that she had "[s]ustained concentration and persistence limitations." (Tr. 69, 88). However, he found that she did not have understanding and memory limitations. (Tr. 92). He opined that Claimant was "not significantly limited" in the ability to carry out very short and simple instructions, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or in proximity to others without being distracted by them, the ability

to make simple work-related decisions, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods. (Tr. 74-75). However, he further opined that Claimant was "moderately limited" in the ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods. (Tr. 74-75). With respect to her limitations in sustained concentration and persistence, Dr. Todd opined that Claimant "is able to attend for short routine 1-3 step tasks w/written [instructions] best so that [Claimant] is able to refer to [instructions]." (Tr. 75).

On reconsideration, Psychologist Jef Boggess, Ph.D. reviewed Dr. Todd's opinion and found that the evidence of record, including the new medical evidence of record developed after Dr. Todd offered his opinion, was "consistent with the initial assessment." (Tr. 99).

After the matter was remanded back to the agency, a third state-agency psychologist—Rosemary L. Smith, Psy.D.—offered another opinion. (*See* Tr. 1065-68). Dr. Smith found greater limitations than Dr. Todd found. She opined that Claimant was moderately impaired in her ability to concentrate, persist, or maintain pace such that she had "[s]ustained concentration and persistence related symptoms." (Tr. 1066, 1068). She assessed "depressive, bipolar and related disorders" as well as "anxiety and obsessive-compulsive disorders" and "neurodevelopmental disorders." (Tr. 1065).

With respect to Claimant's limitations in understanding and memory, Dr. Smith found that Claimant was "moderately limited" in her ability to understand and remember detailed instructions" such that she was "able to understand and remember simple, routine, repetitive tasks." (Tr. 1067-68). With respect to Claimant's limitations in

14

sustained concentration and persistence, Dr. Smith found that Claimant was "moderately limited" in the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods. (Tr. 1068). However, Dr. Smith found that Claimant was "not significantly limited" in her ability to carry out very short and simple instructions; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or in proximity to others without being distracted by them; or the ability to make simple work-related decisions. *Id.* Based upon these findings, Dr. Smith opined that Claimant "is able to carry out simple, routine, repetitive tasks and maintain attention for extended periods of two-hour segments" and "is able to sustain tasks within a reasonable schedule that allows for brief periods of disruption in attendance and tardiness related to her symptoms and in situations that do not require strict production quota." *Id.* Finally, Dr. Smith found that Claimant had moderate social limitations, such that she was "able to sustain tasks that entail only occasional and superficial interactions with others." *Id.*

### C.  Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential

evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive

presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's

"pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (Tr. 979). Next, the ALJ found that the following of Claimant's asserted impairments constituted "severe" impairments: obesity; COPD; asthma; seizures; osteoarthritis of the left shoulder; bilateral carpal-tunnel syndrome; depression; anxiety; and panic disorder. *Id.* The ALJ then determined that none of Claimant's impairments, or a combination thereof, met or medically equaled any of the impairments listed in the Social Security Administration's applicable regulations, at 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 981).

Turning to Claimant's mental-health impairments, the ALJ discussed each of the four areas of mental functioning as part of the special technique. With respect to three of the four areas of mental functioning—(1) understanding, remembering, or applying information; (2) interacting with others; and (3) adapting or managing oneself—the ALJ found that Claimant "has mild limitations." (Tr. 983). However, with respect to the fourth and final area of mental functioning—concentration, persistence, and pace—the ALJ found that Claimant "has moderate limitations." (Tr. 983). In support of this finding, the ALJ pointed to Claimant's statements in her Function Report, (*see* Tr. 327-334), that "she has limitations in concentrating generally, focusing generally, and completing tasks." (Tr. 983). However, the ALJ contrasted these assertions with Claimant's testimony "that she is also able to prepare meals, watch TV, and handle her own medical care." *Id.* Additionally, the ALJ found that "the record fails to show any mention of distractibility." *Id.* In support, the ALJ pointed generally to Claimant's Function Reports (Tr. 319-26, 1216-23), Claimant's September 29, 2020 and June 6, 2024 Consultative Evaluations (Tr.

19

811-17, 1583-89); office treatment records from Holzer Clinic from 2022 (Tr. 919-932, 949-71); and Claimant's June 6, 2024 Consultative Evaluation. (Tr. 983).

Based upon these findings, the ALJ then assessed Claimant's RFC. (Tr. 984). The ALJ determined that Claimant has the ability to perform "light" work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), with the following additional limitations:

> she can never crawl or climb ladders, ropes, and scaffolds. She can occasionally balance, stoop, kneel, crouch, and climb ramps and stairs. She can frequently handle and finger with both hands. She must avoid concentrated exposure to extreme cold, extreme heat, wetness, loud noise, and vibrations. She must avoid even moderate exposure to irritants such as fumes, dust, odors, gases, and poorly ventilated areas, and hazards such as moving machinery and unprotected heights. The claimant can understand, remember, and carry out simple instructions. She can frequently interact with the public, co-workers, and supervisors. She can maintain concentration, persistence, and pace for simple tasks. She can adapt to changes in the work setting.

(Tr. 984). Most relevant to the instant action—and, as Claimant asserts in her opening brief—"[t]he ALJ's RFC finding contains no limitations whatsoever on the claimant's ability to perform any basic mental work activities as they relate to concentration, persistence, or pace." (ECF No. 9 at 5).

Next, the ALJ concluded that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]" (Tr. 989). Relying upon the VE's testimony, the ALJ found that Claimant would be able to perform "the requirements of representative occupations such as a tag inserter . . . a fruit garnisher . . . and a night cleaner," with 20,000 jobs nationally, 15,000 jobs nationally, and 92,000 jobs nationally, respectively. (Tr. 990). As a result, the ALJ concluded that Claimant "has not been under a disability, as defined in the Social Security Act, from March 1, 2015, through the date of [the ALJ's] decision[,]" and the claim for benefits was denied. *See id.*

20

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    DISCUSSION

Claimant sets forth two assertions of error in support of her request for remand in this § 405(g) action. (*See* ECF No. 9). First, Claimant argues that remand is required because "the ALJ's RFC is inconsistent with his own finding of a severe mental impairment causing moderate limitations in concentrating, persisting, or maintaining pace." *Id.* at 3. Second, Claimant argues that remand is proper because "the ALJ

committed significant legal errors in evaluating the medical evidence of record." (ECF No. 9 at 9).

### A.    Adequacy of ALJ's RFC Determination

Claimant's first assertion of error turns upon the adequacy of the ALJ's RFC determination in light of Claimant's mental impairments. Claimant highlights the ALJ's finding of "moderate limitations in concentrating, persisting, and maintaining pace" based upon Claimant's severe mental impairments of depression, anxiety, and panic disorder. (ECF No. 9 at 3). Claimant argues that, based upon this finding of a moderate limitation in concentration, persistence, and pace, the ALJ was *required* to include a limitation in Claimant's RFC "on the basic work activity of understanding, carrying out, and remembering simple instructions." *Id.* at 5. Because the ALJ instead expressly found that Claimant was capable of concentrating, persisting, and maintaining pace to perform all simple tasks instead of limiting Claimant's capacity to perform simple work, Claimant concludes that there is "an unacceptable contradiction" between the ALJ's severity finding and his RFC determination. *Id.* In other words, Claimant argues that the RFC's allowance "for all simple work (Tr. 984)" which "includes an unlimited capacity to perform the entire range of simple instructions" did not adequately include "a limitation on any basic work related activity related to concentrating, persisting, or maintaining pace." (ECF No. 9 at 5). For instance, the ALJ "did not adopt [state-agency psychologists] Dr. Todd and Dr. Boggess' limitation to routine tasks, to 1-3 step tasks, or to tasks with written instructions." *Id.* at 10-11.  In support of her argument, Claimant relies on an opinion from the U.S. District Court for the District of Colorado. *Id.* at 8 (citing *K.L.J. v. Comm'r of Soc. Sec.*, 24-cv-03065, 2025 WL 3170490 (D. Colo. Nov. 7, 2025)).

In response to Claimant, the Commissioner argues that mental limitations identified at step two using the psychiatric review technique do not necessarily indicate work-related functional limitations that must be present in the RFC assessment. (ECF No. 12 at 11) (citing *Wall v. Saul*, 2:20-cv-460, 2021 WL 5225792, at *8 (S.D. W. Va. June 2, 2021), *adopted*, 2021 WL 5230989 (S.D. W. Va. Nov. 9, 2021)). Further, the Commissioner argues that the ALJ adequately explained how Claimant's limitations in mental functioning, including her moderate limitations in concentration, persistence, or maintaining pace, were accounted for in the RFC. (ECF No. 12 at 15).

In her reply, Claimant reiterates her position that "as a matter of law" the ALJ's finding as part of the psychiatric review technique that Claimant had moderate limitations in concentration, persistence, or pace "required a corresponding RFC limitation related to basic work activities related to concentration, persistence, or pace." (ECF No. 13 at 2).

Simply put, Claimant's position is not consistent with Fourth Circuit precedent, which governs the instant action. The Fourth Circuit set forth the framework for analyzing this issue in two opinions: (1) *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), and (2) *Shinaberry v. Saul*, 952 F.3d 113 (4th Cir. 2020). First, in *Mascio*, the ALJ found that the claimant, who suffered from a mental-health disorder, had moderate limitations in concentration, persistence, and pace. *Mascio*, 780 F.3d at 633. Despite this finding, however, the ALJ "ignore[d] (without explanation) Mascio's moderate limitation in her ability to maintain her concentration, persistence, or pace" when he conducted the function-by-function analysis, and "said nothing about Mascio's limitations" in the hypothetical posed to the vocational expert. *Id*. at 633, 637. The Fourth Circuit found that "a remand [was] in order . . . because the ALJ . . . gave no explanation for these omissions." *Id*. at 638. In making its *Mascio* ruling, the Fourth Circuit explained that an ALJ cannot

summarily account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work, because the ability to *perform simple tasks* differs from the ability to *stay on task*. *Id.*

In *Shinaberry*, the Fourth Circuit explained that its *Mascio* decision "did not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." *Shinaberry*, 952 F.3d at 121. "On the contrary, [the Fourth Circuit] explained that an ALJ can explain why a claimant's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in the claimant's RFC." *Id.* (internal quotations omitted). "For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect the claimant's ability to work, in which case it would be appropriate to exclude it from the hypothetical tendered to the vocational expert." *Id.*

The Fourth Circuit in *Shinaberry* added that "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." *Id.* (citation omitted). Thus, in *Shinaberry*, the Fourth Circuit found that the ALJ's analysis was sufficient because he "discussed in detail the psychological evaluations performed by the SSA psychological consultants" who "opined that [the claimant's] concentration and task persistence were adequate[.]"*Id.* at 122. The ALJ "explained that . . . claimant's trouble with memory tasks as noted during the psychological consultative examination, support the additional mental limitation restricting the claimant to jobs requiring only simple, routine, repetitive tasks." *Id.* The Fourth Circuit found that the ALJ adequately "explained why the psychological evidence and [the claimant's] statements

24

support[ed] a mental limitation to simple, routine, and repetitive tasks." *Id*. Thus, the Fourth Circuit held in *Shinaberry* "that the ALJ's findings and the mental limitation included in the RFC [were] sufficiently explained and supported by substantial evidence in the record." *Id*.

Here, the ALJ did not improperly "ignore (without explanation) [Claimant's] moderate limitation in her ability to maintain her concentration, persistence, or pace" like the ALJ in *Mascio*. *See Mascio*, 780 F.3d at 633. Rather, like the ALJ in *Shinaberry*, the ALJ adequately explained why the psychological evidence and the Claimant's statements supported the mental limitations set forth in the RFC. *See Shinaberry*, 952 F.3d at 121.

In the portion of his written decision regarding the RFC determination, the ALJ first acknowledged Claimant's report that she now lives with her son and daughter-in-law, has panic attacks around groups of people, has daily depression because she isn't able to do things she used to do, and has anxiety. (Tr. 984-85, 1007-15). However, the ALJ pointed to other evidence that Claimant is able to care for her personal needs, prepare simple meals, shop, and perform household chores. *Id*. The ALJ next turned to the relevant medical evidence, noting that Claimant's records include a report of a prior history of psychological treatment that ceased and then received medication from her family physician with no other mental health treatment. (Tr. 986-89 (citing Tr. 919-32)). Her mental status examination findings were generally within normal limits, and she reported no severe symptoms. (Tr. 924). The psychological consultative evaluations made similar findings. (Tr. 814-15, 1586-87). Claimant reported being able to care for her personal needs independently; take medications; attend appointments; watch television; perform household chores, including laundry, dishes, sweeping, yardwork, and cooking; spend time with family; and go out to eat. (Tr. 815, 1587). The ALJ noted that the

psychological consultative examiner, Ms. Gettman-Hughes, did not provide any opinions about Claimant's functional abilities. (Tr. 987). The ALJ further noted that clinical mental-status examination findings were generally benign and that the overall evidence was consistent with Claimant's activities of daily living and the treatment for her mental impairments as she was only prescribed psychotropic medications by her family physician and was not receiving any formal mental health treatment. (Tr. 989). Moreover, the ALJ concluded that Claimant's alleged limited daily activities were outweighed by other factors and that, while none of Claimant's activities was dispositive of her ability to perform work activity, the evidence together suggests that she could perform work within the above parameters on a sustained and continuous basis. *Id.*

Additionally, the ALJ considered the relevant medical opinions and prior administrative findings. (Tr. 986-89). He noted that the consultative examiner did not reach any specific opinions regarding functionality, but the objective findings and restrictions were considered in the formulation of the RFC. (Tr. 986-87). The ALJ found both State agency psychological consultants' findings at the initial and reconsideration levels to be persuasive, noting that Claimant's records indicated no greater symptomology than they described, which equated to moderate limitations in the ability to concentrate, persist, or maintain pace, and mild limitations in each of the other three "paragraph B" criteria. (Tr. 988-89 (citing Tr. 67-69, 74-76, 85-86, 90-94, 99, 106)). The ALJ noted that the consultants' findings also were consistent with Claimant's treatment for depression, anxiety, and panic disorder, and that she was currently prescribed psychotropic medications by her family physician but not receiving any formal mental health treatment. (Tr. 811-17, 919-32, 949-71, 988-89).

Elsewhere in the ALJ's written decision, he noted that Claimant shops in stores, goes out to eat, lives with others, performs household chores, prepares meals, does yardwork, attends appointments, cares for her personal needs, and watches television. (Tr. 982-84 (citing Tr. 327-34, 811-17, 919-32, 949-71, 1216-23, 1583-89)). He noted further that Claimant did not receive any specialized psychological treatment and was prescribed medication by her family physician. (Tr. 987 (citing Tr. 919-32)). He explained that the record as a whole indicated Claimant could understand, remember, and carry out simple instructions; frequently interact with the public, co-workers, and supervisors; maintain concentration, persistence, and pace for simple tasks; and adapt to changes in the work setting. (Tr. 984, 987).

In summary, in this case the ALJ limited Claimant to understanding, remembering, and carrying out simple instructions; maintaining concentration, persistence, and pace for simple tasks; and the ability to adapt to changes in the work setting, but he did not limit Claimant to "short, simple instructions" (Tr. 989). The ALJ noted that the RFC finding accommodated those limitations he found to be supported by the record, including objective evidence and Claimant's statements, noting that she was ultimately limited to "understanding, remembering, and carrying out simple instructions," "maintaining concentration, persistence, and pace for simple tasks," with "frequent interaction with the public, co-workers, and supervisors," and the ability to adapt to changes in the work setting" (Tr. 984). In this instance, unlike in *Mascio* but as in *Sizemore* and *Shinaberry*, the ALJ's discussion does not leave the Court to guess at how he accounted for Claimant's moderate limitations in the functional area of concentrating, persisting, or maintaining pace. The ALJ's decision is supported by substantial evidence, and he included sufficient discussion for the Court to trace the

evidentiary basis for his conclusions. Accordingly, Claimant has failed to demonstrate a basis for remand.

### B.      ALJ's Evaluation of the Medical Evidence

Lastly, Claimant argues that remand is proper because the ALJ "erred in failing to evaluate the opinion of the third state agency psychologist, Rosemary Smith, Ph.D." (ECF No. 9 at 10). Claimant highlights that the ALJ did not make any express finding as to the persuasiveness of Dr. Smith's opinion, "particularly based on its supportability and consistency with the other evidence of record, as required by 20 C.F.R. §§ 404.1520c(b)(2), [and] 416.920c(b)(2)." (ECF No. 9 at 10).

In response, the Commissioner concedes that, "[a]dmittedly, the ALJ did not discuss the medical opinion of [Dr.] Smith." (ECF No. 12 at 17). The Commissioner argues, however, that "Dr. Smith's opinion does not materially change the outcome of this case" because the ALJ's RFC addresses the limitations set forth in Dr. Smith's opinion. *Id.* at 17-18. Consequently, the Commissioner concludes that this oversight is merely harmless error. *Id.* Further, while acknowledging that Dr. Smith found Claimant was able to "maintain attention for extended periods of two-hour segments," (Tr. 1067-68), the Commissioner argues that the representative occupations identified by the VE "are unaffected by the additional limitations" because none of them "involve working at a production pace." *Id.* at 18-19. The Commissioner therefore concludes that "there is no prejudice" as "there is no question the ALJ would have reached the same result notwithstanding his initial error." *Id.* at 19.

In reply, Claimant argues that the ALJ's admitted failure to discuss the medical opinion of Dr. Smith "alone requires remand for further proceedings, as it violated the [Agency's] own policy set forth in 20 C.F.R. §§ 404.1520c, 416.920c." (ECF No. 13 at 2-3).

28

Further, Claimant argues that the error is not harmless because the limitations in Dr. Smith's opinion could impact the resulting RFC since "there is a distinction between short and simple instructions." *Id.* at 3. Even if a claimant is limited to *short* instructions, as the ALJ did in this case, Claimant argues that it remains unclear without more "whether that claimant can perform reasoning level 2 occupations[.]" *Id.*

As Claimant pointed out, the Agency's own regulations require an ALJ to consider specific supportability and consistency factors and articulate in his decision how persuasive he found the medical opinions in the case record. *See, e.g.*, 20 C.F.R. § 404.1520c ("We will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative medical findings in your case record."). *See also* 20 C.F.R. § 416.920c (same). Although the ALJ need not discuss every piece of evidence included in the record, he must consider all pertinent medical and non-medical evidence and "explain [any] conciliations and rejections" in a manner "sufficient to enable meaningful judicial review." *Hammond v. O'Malley*, 735 F. Supp. 3d 567, 583 (E.D. Pa. 2024) (finding ALJ failed to properly articulate either the supportability or the consistency of a physician's opinion). Failing to address the supportability of medical opinions is not harmless where it could have a material impact on the RFC determination. *Bowie v. Comm'r of Soc. Sec.*, 608 F. Supp. 3d 1200, 1204 (M.D. Fla. 2022).

Here, the undersigned **FINDS** that Claimant has not demonstrated the ALJ's failure to address Dr. Smith's opinion could have a material impact on the RFC determination. Dr. Smith found that Claimant was able to understand, remember, and carry out simple, routine, repetitive tasks, to maintain attention for extended periods of two-hour segments, sustain tasks within a reasonable schedule, and did not require a

strict production quota. (Tr. 1067-68). The ALJ found in relevant part that Claimant "can . . . maintain concentration, persistence, and pace for simple tasks[.]" (Tr. 987). While Claimant argues that it remains unclear without more "whether [the Claimant] . . . can perform reasoning level 2 occupations" under Dr. Smith's opinions, the Commissioner points out that all three all three of the representative occupations identified by the ALJ involved a reasoning level of one—lower than Dr. Smith's threshold. As such, Claimant has failed to demonstrate error. Because, for the reasons set forth *supra*, the ALJ's decision is supported by substantial evidence, remand is thus improper.

## IV. RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), **GRANT** the Commissioner's request to affirm his decision (ECF No. 12), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTERED:    April 6, 2026

Dwane L. Tinsley
United States Magistrate Judge

31